IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | | |
|---|---|---|
| Johnnie Williams, | ) | Civil Action No.: 9:15-cv-1118-PMD-MGB |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | REPORT AND RECOMMENDATION |
| | ) | OF THE MAGISTRATE JUDGE |
| Lance Corporal Kyle Strickland, Sgt. | ) | |
| Walter Criddle, and Beaufort County | ) | |
| Sheriff Office, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

The plaintiff, Johnnie Williams ("Plaintiff"), appearing *pro se* and *in forma pauperis*, filed this action pursuant to 42 U.S.C. § 1983 against the defendants Lance Corporal Kyle Strickland ("Strickland"), Cpl. Heroux ("Heroux"), Sgt. Walter Criddle ("Criddle"), and the Beaufort County Sheriff Office ("BCSO"), alleging, *inter alia*, that the above-captioned defendants used excessive force against him when they arrested him on the evening of June 29, 2012 in Beaufort, South Carolina.  (Compl. at 2, Dkt. No. 1.)  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this case presents a federal question.  Venue is proper because the events at issue occurred in this District.  28 U.S.C. § 1391.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1) and Local Rule 73.02(B)(2)(e) (D.S.C.), all pretrial matters in cases involving *pro se* litigants are referred to a United States Magistrate Judge for consideration.

**Procedural History**

On March 9, 2015, the Plaintiff filed the instant action against Strickland, Heroux, Criddle, and the BCSO,[1] and on May 14, 2015, the Plaintiff filed an Amended Complaint against Strickland, Criddle, and the BCSO.[2]  (Dkt. Nos. 1, 14.)  Strickland, Criddle, and the BCSO filed an Answer, followed by a Motion for Judgment on the Pleadings on June 24, 2015.  (Dkt. Nos. 30, 34.)  On June 25, 2015, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the Plaintiff was advised of the dismissal procedure and the possible consequences if he failed to adequately respond to the defendants' Motion.  (Dkt. No. 36.)  After the court granted an extension of time to the Plaintiff, he filed a Response in Opposition to the defendants' Motion on the Pleadings, and a Declaration.  (Dkt. Nos. 41, 42.)

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1) and Local Rule 73.02(B)(2)(e) (D.S.C.), all pretrial matters in cases involving *pro se* litigants are referred to a United States Magistrate Judge for consideration.  On January 15, 2016, the undersigned United States Magistrate Judge issued a Report and Recommendation which recommended that the BCSO, as a state agency, be dismissed from this action on the grounds that it was entitled to Eleventh Amendment immunity, and, to the extent the action had been filed against Strickland and Criddle in their official capacities, they likewise were entitled to Eleventh Amendment

---

[1] It appears from the court's review of the Plaintiff's envelope that it was sent from a residential address.  Accordingly, the *Houston v. Lack* "mailbox rule" has no application to the present case.  *See Houston v. Lack*, 487 U.S. 266, 270 (1988).

[2] Because Plaintiff did not name Heroux as a Defendant in his Amended Complaint, Heroux was terminated as a party to this action.  (*See generally,* Dkt. No. 14.)

immunity.  (Dkt. No. 44.)  However, the undersigned recommended that the action be allowed to proceed against Strickland and Criddle in their individual capacities.  (*Id.* at 6-7.)

On January 28, 2016, the District Court dismissed the BCSO from this action and dismissed the action against Strickland and Criddle insofar as it had alleged claims against them in their official capacities.  (Dkt. No. 49.)  The Plaintiff's action remained against Strickland and Criddle (collectively, the "Defendants") in their individual capacities.

On March 14, 2016, the Defendants filed a Motion for Summary Judgment.  (Dkt. No. 57.)  Pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the Plaintiff again was advised of the dismissal procedure and the possible consequences if he failed to adequately respond to the Defendants' Motion.  (Dkt. No. 58.)  The Plaintiff timely responded with a Motion for Summary Judgment, and the Defendants filed a Response thereto.  (Dkt. Nos. 60, 61.) Thereafter, the Plaintiff requested that a subpoena be issued to the Medical University of South Carolina ("MUSC") so that he could obtain certain documents from MUSC relating to his hospitalization from May 23, 2013 to June 14, 2013, which was a result of the alleged use of excessive force by the Defendants.  (Dkt. No. 43.)  The court construed the Plaintiff's motion as one for a subpoena duces tecum, and granted the motion on July 1, 2016.  (Dkt. No. 69.) Because the *pro se* Plaintiff had sought production of the documents after he filed his Motion for Summary Judgment, the court issued an order allowing the Plaintiff the opportunity to supplement his Motion, or file any further response to the Defendants' Motion for Summary Judgment, by September 22, 2016.  (Dkt. No. 86.)  On September 21, 2016, the Plaintiff filed a Response in Opposition to the Defendants' Motion.  (Dkt. No. 90.)  Therefore, the case is ripe for review by the court.

3

**Facts**

The Plaintiff's Verified Amended Complaint states that on June 29, 2012, the Plaintiff, who lives in Savannah, and his six year old son were in Beaufort, South Carolina to attend a "family get together" at the Plaintiff's mother's home. (Am. Comp. at 4, Dkt. No. 14.) The Plaintiff stopped at a gas station and Anthony Ancrum asked Plaintiff "for a ride to his sister's apartment where he lived," and Plaintiff agreed. (*Id.*). The Plaintiff's son was sitting in the "passenger front seat," so Ancrum sat in the back seat of the vehicle. (*Id.*) The Plaintiff does not explain the events of that evening in any detail, except to state that "on this night I was doing a friend a favor, by giving [him] a ride home [to the Canal Apartments], and ended up shot in my back." (*Id.*) The Plaintiff alleges that he "almost died at the scene after waiting on [an] ambulance for almost 40 minutes." (*Id.*)

According to the Plaintiff, "the two employees of the Beaufort Sheriff['s] Office, Lance Corporal Kyle Strickland and Sgt. Walter Criddle" were "the two officers that fired the[ir] weapons into [Plaintiff's] car, hitting [Plaintiff] in [his] back." (*Id.* at 5.) He alleges he later found out that it "was the bullet" from Strickland's weapon that "struck [Plaintiff] in [his] back." (*Id.*). The Plaintiff alleges the injuries he received that night were "life threatening," and that when he arrived at Beaufort Memorial Hospital he was told that he "would have to be flown to [MUSC] to have emergency surgery to remove the . . . bullet that was still in [his] stomach." (*Id.*). After he arrived at MUSC, he had to have numerous surgeries and other procedures to save his life, and he was put in a medically-induced coma on June 30, 2012.[3] (*Id.*). The Plaintiff

---

[3] The Plaintiff was discharged from MUSC on August 17, 2012. (Pl. Mot. for Summ. J. at 6, Dkt. No. 60.) Upon discharge, he was placed under arrest by the BCSO on charges related to this incident, provided with his *Miranda* rights, and transported to the Beaufort County

alleges that "[a]s a result of this unwarranted[] and brutal attack," he "sustained extensive damage to [his] stomach." (*Id.* at 6.) The Plaintiff, who was forty years of age at the time of the incident, claims that his doctor told him he would not be able to work again; he has since been awarded Social Security disability benefits. (*Id.*)

The Plaintiff alleges he again was hospitalized from April 23, 2013 until June 14, 2013 due to complications from his gunshot wound. (*Id.*) In the "Relief" section of his Amended Complaint, Plaintiff states that he has filed this action "for a monetary recovery for violating [his] constitutional rights (excessive force)." (*Id.* at 7.) The Plaintiff seeks an award of damages for his pain and suffering and his "constant medical attention," and also seeks punitive damages. (*Id.*)

Strickland, Heroux, and Criddle (the "Officers") were assigned to the Beaufort/Jasper Multi-Agency Drug Task Force and were working on the evening of June 29, 2012. (*See* SLED Investigative Rep., Dkt. No. 57-5 at 5.) Criddle and Strickland were riding together in a black Chevrolet unmarked patrol car. (*See* SLED Investigative Rep.(Strickland Statement), Dkt. No. 57-5 at 7.) It is not known to the court whether Heroux was in an unmarked vehicle, or whether any of the Officers were in uniform.

At around 9:00 p.m. on June 29, 2012, Heroux saw a 1991 white four door Cadillac Deville with a Georgia license tag in the area of Highway 21 and Highway 170. (Heroux Aff. ¶ 4, Dkt. No. 57-3; SLED Investigative Rep. at 5, Dkt. No. 57-5.) Heroux ran the Georgia tag through Beaufort County Dispatch, learned that the tag had been stolen, and so advised Criddle,

---

Detention Center. (Supp. Incident Rep., Dkt. No. 57-5 at 26;*see also Miranda* Warning Form, Dkt No. 57-5 at 37.) His bond hearing was set for August 18, 2012, and he was scheduled to appear in General Sessions Court on September 14, 2012. (Dkt. No. 57-5 at 38, 26.)

5

who was riding with Strickland in a car ahead of Heroux. (Heroux Aff. ¶¶ 4-5; Criddle Aff. ¶¶ 4-5, Dkt. No. 57-2.) Criddle told Heroux to stop the Cadillac, and Heroux followed the car onto Salem Road. (Heroux Aff. ¶¶ 6-7.) The Cadillac turned into the Canal Apartments. (Heroux Aff. ¶ 9; Criddle Aff. ¶ 7; Strickland Aff. ¶ 7; Dkt. No. 57-4.) Heroux followed the Cadillac into the apartment complex and activated his blue lights and siren; the Cadillac stopped between the first and second buildings on the left. (Heroux Aff. ¶ 10; Strickland Aff. ¶¶ 8-9.) Heroux got out of his car and walked to the front of it, but the Cadillac drove off toward the rear of the apartment complex. (Heroux ¶¶ 11-12.)

Heroux got back into his patrol car and followed the Cadillac until it stopped in a parking space; Heroux stopped his car near the Cadillac and approached the driver's door. (Heroux ¶¶ 13-15). Strickland and Criddle arrived at the scene and got out of their vehicle. (Criddle Aff. ¶ 10; Strickland Aff. ¶ 10.) When Heroux was about ten feet away from the Cadillac, the driver of that car looked at Heroux, turned the front wheels to the right, and backed up at a high rate of speed, which caused the front end of the Cadillac to "violently whip around in [Heroux's] direction." (Heroux Aff. ¶¶ 16-17; Criddle Aff. ¶ 10.) Heroux backed up towards the front tire area of his car, and he "believed by the driver's actions that he tried to kill me with his car." (Heroux Aff. ¶¶ 18-19.) By the time Heroux got to his vehicle, the Cadillac's front bumper passed within about an inch from the driver's side front bumper of Heroux's car. (Heroux Aff. ¶ 20.) Then, the Cadillac backed up and positioned itself head to head with Heroux's car, about ten feet away, but offset to the right of Heroux's car. (Heroux Aff. ¶ 21.)

By this time, Heroux had drawn his duty weapon and began to approach the Cadillac, and saw Strickland walking up to the Cadillac. (Heroux Aff. ¶¶ 22-24.) Strickland shouted

6

"Stop–Police" a few times.  (Strickland Aff. ¶ 15.)  The Plaintiff then drove forward, and swerved toward Heroux, "in what [Heroux] believed was an attempt to kill [him] by running him over."  (Heroux Aff. ¶ 25.)  The driver of the Cadillac straightened out the wheel and accelerated toward Strickland, who was positioned in the middle of the Cadillac's headlights.  (Heroux Aff. ¶¶ 26-27; Strickland Aff. ¶¶ 16-17.)  Strickland backed up as quickly as he could, and with his service weapon drawn, shouted for the driver to stop, but the Cadillac continued to drive toward him.  (Strickland Aff. ¶¶ 18-20.)

Heroux believed Strickland's life to be in danger, so he fired three or four times at the driver.  (Heroux Aff. ¶ 28.)  Strickland also feared for his life, and fired three or four shots into the front windshield; he jumped behind Criddle's parked patrol car as the Cadillac swerved towards him, nearly striking his legs.  (Strickland Aff. ¶¶ 21-22, 24.)  Contrary to the Plaintiff's claim, Criddle did not fire his service weapon.  (Criddle Aff. ¶ 14.)

The Cadillac passed Strickland, struck a small tree and some shrubs, and the engine stopped.  (Heroux Aff. ¶ 29; Criddle Aff. ¶ 15; Strickland Aff. ¶¶ 25-26.)  The Officers ran to the vehicle; Heroux saw the driver's door and the rear passenger driver's side door open, and he saw a child in the car.  (Heroux Aff. ¶¶ 30-32.)  Strickland also saw the child (later identified as the Plaintiff's son) and removed him from the car.  (Strickland Aff. ¶  27.)  Heroux saw a male lying face down on the back seat, yelling that he had been shot, and a male in the front seat, lying on his back and leaning towards the passenger side.  (Heroux Aff. ¶ 32.)

Heroux ordered the men out of the Cadillac and handcuffed them.  The driver of the car, later identified as the Plaintiff, asked, "Why did you shoot me?" and Heroux responded: "You tried killing me by running me over with the car."  (Heroux Aff. ¶¶ 33-35.)  The Plaintiff said,

"No I didn't" and the passenger, later identified as Anthony Ancrum, said, "Yeah you did!" (Heroux Aff. ¶¶ 37-38.)  Heroux and Criddle examined the two handcuffed men and EMS was called.  (Heroux Aff. ¶ 39.)  The Plaintiff was charged with three counts of Attempted Murder, one count of Child Endangerment, and Failure to Stop for a Blue Light.  (Incident Rep., Dkt. No. 57-5 at 12; *see also* Arrest Warrants, Dkt. No. 57-5 at 31-35.)

SLED took the service weapons belonging to Strickland and Heroux into custody. (SLED Chain of Custody form, Dkt. No. 57-5 at 43.)  The BCSO had the Cadillac towed to its impound lot.  (BCSO Vehicle Impound and Inventory Record, Dkt. No. 57-5 at 46.)  The general condition of the car was marked as "poor;" there is no indication of the specific condition of the windshield, the side windows, or the rear window.  (*Id.*)

SLED investigated the shooting and based on that report, the Solicitor determined that there was no criminal conduct on the part of the Officers.  (Dkt. No. 57-5 at 2.)

## STANDARDS OF REVIEW

### Summary Judgment

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *The News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In ruling on a motion for summary judgment, "'the nonmoving party's evidence is to be believed, and all justifiable inferences are to

be drawn in that party's favor.'" *Id.* (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)); *see also Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123-24 (4th Cir. 1990). Thus, the Plaintiff is to "have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in it resolved favorably to him." *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir.1990) (en banc) (citing *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir.1979)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

To show that a genuine dispute of material fact exists, a party may not rest upon the mere allegations or denials of his pleadings. *See Celotex*, 477 U.S. at 324 (Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves). Rather, the party must present evidence supporting his or her position through "depositions, answers to interrogatories, and admissions on file, together with . . . affidavits, if any." *Id.* at 322; s*ee also Cray Commn's, Inc. v. Novatel Computer Systems, Inc.*, 33 F.3d 390 (4th Cir.1994); Local Civil Rules 7.04, 7.05, D.S.C.

When confronted with cross-motions for summary judgment, "[t]he role of the court is to 'rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard.'" *Reynolds v. Wyndman Vacation Resorts, Inc.,* C.A. No.: 2:14-2977-PMD, 2016 WL 362620, at *2 (D.S.C. Jan. 29, 2016) (quoting *Northfield Ins. Co. v. Boxley*, 215 F. Supp. 2d 656, 657 (D. Md. 2002)). "The mere fact that both parties seek summary judgment "does not 'establish that there is no issue of fact and require that summary judgment be granted to one side or another.'" *Reynolds*,

2016 WL 362620, at *2 (quoting *World-Wide Rights Ltd. P'ship v. Combe Inc.*, 955 F.2d 242, 244 (4th Cir. 1992)).

### The *Pro se* Pleading

The court is required to liberally construe *pro se* documents, *Estelle v. Gamble,* 429 U.S. 97 (1976), holding them to a less stringent standard than those drafted by attorneys, *Hughes v. Rowe,* 449 U.S. 5, 9-10 (1980) (per curiam).  The mandated liberal construction afforded *pro se* pleadings means that if the Court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so, but a court may not rewrite a complaint to include claims that were never presented, *Barnett v. Hargett*, 174 F.3d 1128, 1133 (10th Cir. 1999), or construct the plaintiff's legal arguments for him, *Small v. Endicott*, 998 F.2d 411, 417-18 (7th Cir. 1993), or "conjure up questions never squarely presented" to the court, *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985).  Further, the requirement of liberal construction does not mean that the Court can ignore a clear failure in the pleading to allege facts which set forth a claim currently cognizable in a federal district court.  *Weller v. Dep't of Soc. Servs.,* 901 F.2d 387, 391 (4th Cir. 1990).

## DISCUSSION

### The Defendants' Arguments

The Defendants have moved for summary judgment, advancing two arguments: first, the Defendants' use of force against the Plaintiff was objectively reasonable in light of the Plaintiff's apparent attempt to run over the officers with his vehicle; second, in the alternative, the Defendants are entitled to qualified immunity because it was reasonable under the circumstances for them to believe that the Plaintiff was attempting to use deadly force against them while he

was attempting to flee.  (Def. Mot. 1-2, Dkt. No. 57.)  In addition, the Defendants contend that

because Strickland's bullet struck the Plaintiff, and Criddle never fired his service weapon,

Criddle could not have violated the Plaintiff's constitutional rights.  (Def. Mem. 4, Dkt. No. 57-

1.)

### The Plaintiff's Arguments

The Plaintiff has moved for summary judgment on the ground that he was "[a]mbush[ed]"

by the Defendants "only because" his car had Georgia tags, "and [Beaufort is] a city thats know

for heavey drugs trafficing but I was none of them."  (Dkt. No. 60 at 1.)  The Plaintiff argues that

his case should not be dismissed because neither of the Defendants works at the BCSO at this

time; he reasons that "now if there was not any wrong doing aganst [sic] officers Strickland and

Criddle why did both officers leave at the same time of my case going on?"  (*Id.* at 2 (emphasis

omitted.)  As further evidence of the Defendants' wrongdoing, the Plaintiff notes that his

criminal case is almost 47 months old, and he has not been indicted by a grand jury on any

criminal charges.  (*Id.*)  The Plaintiff also argues that there were no photographs taken of the

crime scene,[4] and the patrol cars did not have dashboard cameras, which leads him to conclude

that "the defendants have every thing to hide!!"  (*Id.* at 2-3, 9, 12.)  The Plaintiff argues that

Ancrum has offered to testify at trial that he never said, "Yea[h] he did" and that the Defendants

are lying about this.  (*Id.* at 3.)

In apparent rebuttal of the Defendants' claim that the Plaintiff tried to run down the

Officers, the Plaintiff states in his Memorandum that he had no motive to run over them–he

---

[4] According to the SLED Report submitted by the Defendants, SLED took photographs of
the crime scene.  (*See* Dkt. 57-5 at 10.)  The Defendants did not submit any photographs to the
court.

simply was visiting Beaufort to see his mother, and his sister who had come in from out of town.

(*Id.* 3-4).  The Plaintiff states that since he was driving with a suspended license, he had $575.00

for his bond in case he was stopped by the police for that offense.[5]  (*Id.* at 4-5.)  He further argues

that he did not know that his car had a stolen tag on it, but in Savannah, where he lives:

> the juveniles switch tags to other peoples cars all [the] time for them to joy ride [and]
> at the time of the sho[o]ting I did not have motive to try to run over the police
> officers [because] there were no warrants out for my arrest for any thing.  I did not
> have any elleagel drug's on my persons' or in side the car[.]

(*Id.* at 5.)  In addition, the Plaintiff states that after he was released from MUSC, he went home to

Georgia on an unsecured bond, and none of the three officers (whom he allegedly had tried to

murder) opposed giving him an unsecured bond.  (*Id.* at 6; *see also* "Beaufort County Victim

Notification Information Form" with respect to each Officer, at 38-40, Dkt. No. 57-5.)

The Plaintiff further argues that "the court system in Beaufort" never sent him

information about any court dates, and when he went to the courthouse, he was not allowed

inside, and had to call his attorney.  (Dkt. No. 60 at 7.)  The Plaintiff argues that his criminal

charges have been dismissed, and claims that the Defendants have not told the District Court

about the dismissal because they do not want the Court to have this knowledge.  (*Id.* at 8-9.)

In support of his prayer for damages, the Plaintiff has described in detail the physical

symptoms he suffers on a daily basis as a result of the shooting.  (*Id.* at 10-12.)  The Plaintiff also

has appended to his Motion copies of various documents, including three photographs (including

one allegedly taken at MUSC the day after he was taken out of his medically-induced coma); a

copy of MUSC's discharge summary dated August 17, 2012; a bill from MUSC for his

---

[5] The Plaintiff's wallet and his money were taken into evidence at the BCSO.  (Supp.
Incident Rep., Dkt. No. 57-5 at 18; Evidence Submittal Form, Dkt. NO. 57-5 at 41.)

admission from June 30, 2012 to August 17, 2012, and a copy of his arrest warrant for the

attempted murder of the Defendants on June 29, 2012, for which he had not been indicted as of

March 29, 2016.  (Dkt. 60-1.)  Notably, the Plaintiff's medical records from MUSC state that he

"sustained a gunshot wound to his right back with an intraperitoneal trajectory[.]"  (*See* MUSC

History and Physical Report dated June 30, 2012, Dkt. No. 60-1 at 3.)

### Analysis

Section 1983 "is not itself a source of substantive rights," but merely provides "a method

for vindicating federal rights elsewhere conferred."  *Baker v. McCollan*, 443 U.S. 137, 144, n.3

(1979). An excessive force claim brought under § 1983 implicates the Fourth Amendment, which

governs claims of excessive force during the course of an arrest, investigatory stop, or other

seizure of a person.  *Schultz v. Braga*, 455 F.3d 470, 476-77 (4th Cir. 2006) (citing *Graham v.

Conner*, 490 U.S. 386, 388 (1989)).

The Defendants first move for dismissal of Criddle on the grounds that because Criddle

did not fire any shots, "Criddle could not have violated the Plaintiff's rights."  (Defs.' Mem. 4,

Dkt. No. 57-1.)  The court agrees that Criddle did not effect a "seizure" of the Plaintiff.  "[T]he

word 'seizure' [means] a 'taking possession [of]' . . . .  For most purposes at common law, the

word connoted not merely grasping, or applying physical force to, the animate or inanimate

object in question, but actually bringing it within physical control."  *California v. Hodari D.*, 499

U.S. 621, 624 (1991) (citations omitted).  There are two circumstances that may constitute an

arrest, and therefore a seizure, under the Fourth Amendment.  *Id.*

> First, the [Supreme Court] concluded that a person is "seized" if he is touched by a
> police officer with lawful authority and purpose to arrest, even if that person is not
> subdued. . . .  Second, following [the Supreme Court's] decision in *Terry v. Ohio*,

> 392 U.S. 1, 19 n.16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Court also concluded that a person is "seized" under the Fourth Amendment upon the submission of that person to an official "show of authority."

*United States v. Letsinger*, 93 F.3d 140, 143 (4th Cir. 1996) (citing *Hodari D.*, 499 U.S. at 626-29). If "physical force is absent, a seizure requires both a 'show of authority' from law enforcement officers and 'submission to the assertion of authority' by the [individual]." *United States v. Stover*, 808 F.3d 991, 995 (4th Cir. 2015) (quoting *Hodari D.*, 499 U.S. at 626). The Fourth Circuit, in an unpublished opinion, has held that there is no seizure of a person when the bullets from a deputy's weapon never touched that person. *Estate of Rodgers ex rel. Rogers v. Smith*, 188 F. App'x 175, 180-81 (4th Cir. 2006). In *Rodgers*, a police officer fired at the Plaintiff, who did not acknowledged the officer's show of authority, and the officer's gunshot did not strike the Plaintiff. *Id.* at 179. Judge Wilkins, writing for the panel, held that, because the plaintiff did not submit to law enforcement's show of authority and, alternatively, "because the bullets from [the officer's] weapon never touched [the plaintiff]," the officer did not seize the plaintiff. *Id.* at 180-81 (citing *Carr v. Tatangelo*, 338 F.3d 1259, 1267, 1270-71 (11th Cir. 2003)).

Criddle's affidavit does not state whether he identified himself as a sheriff's deputy, but he does aver that he did not fire at the Plaintiff. (*See* Criddle Aff., Dkt. No. 57-2.) It follows, then, in light of *Rodgers*, that Criddle never effectuated a seizure of the Plaintiff because the Plaintiff did not submit to his authority as a law enforcement officer, and because Criddle did not shoot at the Plaintiff. Therefore, it is recommended that Criddle be granted summary judgment, and be dismissed from this action.

The court now turns to Strickland's actions. It is well-settled that an arrest "by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). The reasonableness of a search is analyzed "by balancing the extent of the intrusion against the need for it[.]" *Id.* at 7-8. Fourth Amendment claims of excessive use of force during an arrest are considered under an "objective reasonableness" standard. *Graham*, 490 U.S. at 399 (citations omitted); *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc); *Culosi v. Bullock*, 596 F.3d 195, 201 (4th Cir. 2010). A court's determination of what is objectively reasonable depends on the conditions that exist at the time the alleged excessive force is used, recognizing that police officers are often forced to make split second judgments in circumstances that are tense, uncertain, and rapidly evolving. *Graham*, 490 U.S. at 396. "[R]easonableness is evaluated from the perspective of the officer on the scene, not through the more leisurely lens of hindsight." *Abney v. Coe*, 493 F.3d 412, 415 (4th Cir. 2007) (citing *Graham*, 490 U.S. at 396-97; *Milstead v. Kibler*, 243 F.3d 157, 163 (4th Cir. 2001)). When determining objective reasonableness, a court must consider "whether the totality of the circumstances justifie[s] a particular sort of search or seizure." *Garner*, 471 U.S. at 8-9. Thus, the court must "focus on the facts and circumstances of each case, taking into account 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Yates v. Terry*, 817 F.3d 877, 885 (4th Cir. 2016) (quoting *Graham*, 490 U.S. at 396).

In 1985, the Supreme Court held that the Fourth Amendment limited a police officer's use of deadly force to those situations, among others, where he has probable cause to believe that a suspect poses an immediate threat of physical harm to the officer or others. *Garner*, 471 U.S.

15

at 11.  After the threat of immediate harm has passed, an officer may not use deadly force to apprehend a suspect.  *Waterman v. Batton*, 393 F.3d 471, 482 (4th Cir. 2005).  In *Waterman*, the driver of a vehicle (also named Waterman) was observed at the Baltimore Washington International Airport on a November afternoon driving 51 miles per hour in a zone marked 25 miles per hour.  *Id.*, 393 F.3d at 473.  An airport police car activated its lights and sirens, and initiated pursuit.  *Id.*  After Waterman did not stop, another airport police car joined the pursuit.  *Id.*  The vehicle proceeded northbound on I-95, towards the Fort McHenry Tunnel.  *Id.* at 474.  The officers radioed other airport officers at the toll plaza on the other side of the Tunnel, and these officers took positions and one put out "stop sticks." *Id.*  at 474.  During the pursuit, one of the officers following the vehicle radioed to other officers that the vehicle "just tried to run me off the road . . . ."  *Id.* (citing *Waterman v. Batton*, 294 F. Supp. 2d 709, 714 (D. Md. 2003)).  The other officers heard this communication, as well as a communication to "use caution" with Waterman.  *Id.*  Waterman drove through the Tunnel, and toward lane 12, the left-most lane at the toll plaza.  *Id.*  By this time, the pursuit had gone on for ten minutes, and Waterman was driving toward the toll plaza at a normal speed, keeping a safe distance from cars in front of him.  *Id.*

> [F]ive uniformed . . . officers . . . emerged from around the concrete island located between lanes 11 and 12. With their weapons drawn, the officers approached Waterman's vehicle from the front and passenger sides, yelling for Waterman to stop.
>
> Waterman slowed as he approached the toll plaza, then coasted for about one second at approximately 11 miles per hour.  The vehicle ahead of Waterman's then began to move forward.  Immediately thereafter, the rear of Waterman's vehicle dipped down and rose back up – a motion the officers described as "lurching" or "lunging" forward – and Waterman began to accelerate in the general direction of the toll plaza and the officers ahead of him.  At the instant of acceleration, Officer Keel was about 72 feet ahead of the vehicle; Officer Heisey, 38 feet ahead; Officer Hames, a little

more than 23 feet ahead; and Officer Batton, a little more than 16 feet ahead. Although none of the officers were directly in front of Waterman's vehicle, they stood only a few feet to the passenger side of the vehicle's projected path.

Perceiving the lurching of the vehicle and Waterman's acceleration as the beginning of an attempt to run them over, Appellants began firing their weapons as soon as Waterman accelerated. As the officers shot at him, Waterman's vehicle reached a top speed of approximately 15 miles per hour. Waterman's vehicle then passed all of the officers, avoiding them by several feet and temporarily stopping behind another vehicle blocking its path. As Appellants scrambled toward Waterman, they continued to fire their weapons at him from the passenger side of the vehicle and from behind, ceasing their fire as he passed through the toll plaza. In all, within the approximately-six-second period after Waterman's vehicle lurched forward, Officer Batton fired four rounds, Officer Keel, two, and Officer Heisey, two.

When Waterman's vehicle passed through the toll lane, it ran over the stop sticks. Officer Watkowski followed Waterman through the lane in his vehicle and collided with him, bringing both vehicles to a stop.

Waterman sustained five gunshot wounds: a shot that grazed his front right shoulder; a shot that entered the front right side of his neck and was recovered from his left shoulder; and shots that went through his right arm, right thigh, and left thigh. About two minutes after his vehicle came to a stop, several officers pulled Waterman from his vehicle and attempted to administer CPR. An ambulance then transported Waterman to John Hopkins Medical Center, where he was pronounced dead at 4:10 p.m. It was later determined that the shot that entered Waterman's neck was rapidly fatal, meaning that it killed him within 30 seconds to two minutes.

Id. at 474-75. The Court noted that "[r]egardless of exactly where each officer was positioned when Waterman accelerated, the video [from the police cars] leaves no doubt that at the moment of acceleration, there were officers positioned close enough to the vehicle that Waterman could have run them over in approximately one second." Id. at 475 n.6.

As a result of that event, Waterman's personal representative and parents filed suit in state court, alleging several state law causes of action, and a Fourth Amendment claim (pursuant to § 1983) alleging that the officers unjustifiably used deadly force. Id. at 475. The officers removed the case to federal court, and later moved for summary judgment on several grounds,

and claimed were entitled to qualified immunity on the Fourth Amendment claim.  The district

court denied the defendants' motion in its entirety.  *Waterman v. Batton*, 294 F. Supp. 2d at 739.

On appeal, Judge Wilkins and Judge Hudson,[6] over a dissent by Judge Diana Gribbon

Motz, held that the officers did not violate the Fourth Amendment when they used deadly force

against Waterman as he accelerated his vehicle toward them.  393 F.3d at 479.  As the majority

explained: "[T]he closeness of the officers to the projected path of Waterman's vehicle is crucial

to our conclusion that deadly force was justified.  Any reasonable factfinder considering all of the

forecasted evidence in the record would determine that Waterman was accelerating in [the

officers'] general direction and that Officers Batton and Heisey could have been run over in

about one second if Waterman had turned slightly toward them."  *Id.*  However, the majority also

held that the officers *did* violate Waterman's Fourth Amendment rights when they continued to

fire at him after the vehicle passed them and was no longer a danger to them.  *Id.* at 480-482.  As

Judge Wilkins explained:

> It is established in this circuit that the reasonableness of an officer's actions is
> determined based on the information possessed by the officer at the moment that
> force is employed.  To simply view all of the force employed in light of only the
> information possessed by the officer when he began to employ force would limit, for
> no good reason, the relevant circumstances to be considered in judging the
> constitutionality of the officer's actions.  We therefore hold that force justified at the
> beginning of an encounter is not justified even seconds later if the justification for the
> initial force has been eliminated.

393 F.3d at 481-82 (internal citation omitted).  The *Waterman* majority then listed a number of

opinions that lent support to the panel's conclusion to undertake a separate analysis of the

gunshots fired after the vehicle had passed the officers:  *Abraham v. Raso*, 183 F.3d 279, 294 (3d

---

[6] Henry E. Hudson, United States District Judge for the Eastern District of Virginia.

18

Cir. 1999) (finding issue of fact regarding whether officer was justified in firing on vehicle from side after stepping out of the way to avoid being run over, and explaining that "[a] passing risk to a police officer is not an ongoing license to kill an otherwise unthreatening suspect"); *Dickerson v. McClellan*, 101 F.3d 1151, 1162 n.9 (6th Cir. 1996) (noting that analyzing separate segments of single encounter may be appropriate if "the officers' initial decision to shoot was reasonable under the circumstances but there was no need to continue shooting"); *Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993) (holding that when fleeing felon tossed a mesh bag weighing four or five pounds toward the officer, the officer would have been justified if he fired at that moment out of fear that the bag might knock his firearm out of his hand, but that he was not justified in firing after bag hit him and fell to the ground without injuring him and suspect turned and ran); *see also Bates ex rel. Johns v. Chesterfield Cnty.*, 216 F.3d 367, 371-72 (4th Cir. 2000) (concluding with regard to escalating physical confrontation between officer and resisting suspect that officer's use of force was reasonable "[a]t every stage of the . . . incident"); *Hopkins v. Andaya*, 958 F.2d 881, 886-88 (9th Cir. 1992) (per curiam) (dividing several-minute encounter into two segments and holding that even if the first application of force was constitutional, the second may not have been)). *Waterman*, 393 F.3d at 481-82.

Turning to the issue at hand, Strickland has averred in pertinent part:

That the driver increased his speed and headed directly toward my position.

That I had my service weapon drawn and shouted for the driver to stop, but the driver continued directly at me.

That I felt my life was in danger and that the driver's intentions were to run me over.

That because of the feelings I fired approximately three or four shots directly into the area of the front windshield where the driver would be positioned in order to stop the threat.

. . .

That I jumped behind Sgt. Criddle's parked patrol car and the driver swerved towards me nearly striking my legs. That the vehicle passed my position and the vehicle struck a small tree and some shrubs.

(Strickland Aff. ¶¶ 19-25.)

The court finds that there exist genuine disputes of material fact in this case at this time. Although the Defendants claim that the Plaintiff was trying to run over them, the Plaintiff insists he had no motive to do so, and, in fact, that he was "ambushed" by the three Officers.

The most glaring example of disputed facts concerns the circumstances of the shooting. Strickland claims he shot through the Cadillac's windshield as it was driven toward him. (Strickland Aff. ¶ 22.) The Defendants admit that Strickland's bullet hit the Plaintiff and caused his injuries. (Def. Mem. Supp. Summ. J. at 4, Dkt. No. 57-1.)  The court cannot reconcile the foregoing statements with the undisputed medical evidence that shows that the Plaintiff was shot in the right side of his back (*See* MUSC History and Physical Report dated June 30, 2012, Dkt. No. 60-1 at 3), nor can it reconcile those statements with the BCSO's statement that Ancrum, too, was shot in the back.  (*See* BCSO Supp. Incident Rep.: "Ancrum's injuries consisted of a gunshot wound to the back." Dkt. No. 57-5 at 15.)  Considering the evidence in the light most favorable to the Plaintiff, the court finds that Strickland is not entitled to summary judgment at this time.

**CONCLUSION**

**Wherefore**, it is **RECOMMENDED** that the Defendants' Motion for Summary

Judgment (Dkt. No. 57) be **GRANTED IN PART**, as to Criddle, and **DENIED IN PART**, as to

Strickland.  It is further **RECOMMENDED** that the Plaintiff's Motion for Summary Judgment

(Dkt. No. 60) be **DENIED**.

IT IS SO RECOMMENDED.


January 31, 2017

Charleston, South Carolina

MARY GORDON BAKER
UNITED STATES MAGISTRATE JUDGE

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. **Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.** "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

**Robin L. Blume, Clerk**
**United States District Court**
**Post Office Box 835**
**Charleston, South Carolina 29402**

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).